13-1773, 13-1859, Secretary of Labor v. Blue Cross and Blue Shield, excuse me, Hi-Lex America v. Blue Cross and Blue Shield. Arguments not to exceed 15 minutes for defendant, 10 minutes for plaintiff, 5 minutes for amicus. Mr. Walsh for the Appellant Cross Appellee. It pleases the Court. James Walsh on behalf of Blue Cross and Blue Shield of Michigan. I'd like to reserve five minutes for rebuttal. Yes. Hi-Lex Corporation signed a contract with Blue Cross that called for the payment of certain fees that we've been calling access fees. Those fees were paid with Hi-Lex's money. According to the SPD, there were no plan assets to be used. Now five panels of the Michigan Court of Appellate and said it was unambiguous and enforceable. The District Court, however, relying primarily, if not solely, on the testimony of a detection deception expert, a psychologist from Arizona named Judy Bergun, found that the contract was misleading, fraudulent even. I think this Court cannot rule that federal common law can look to junk science and not state law for its sources. We all know that ERISA's purpose is to protect employee participants and beneficiaries in various programs. I suppose the Court actually could find fraudulent and deceptive practices even without an expert, right? The Court could, but that's the way it's done oftentimes before a jury, you know. But the District Court pointed only to Judy Bergun and her finding that the contract was misleading. And I... Is that a basically a clearly erroneous kind of challenge that you're raising now? No. Construction of a contract is a question of law. I find it interesting that this Court, both in Pipefitters 3... Bergun wasn't used to interpret a contract, was it? Yes, she was. She said the way this contract was structured was misleading because... It's different from what the contract says. It's misleading, you know. I mean... The District Court attributed no meaning to the contract. The key provision in the contract that authorizes the charging of these fees was quoted in both Pipefitters 3 and Pipefitters 4. Pipefitters 4 said the language was opaque and didn't cabin Blue Cross's discretion, but either Pipefitters 3 or Pipefitters 4 said this language had no meaning or was misleading. Counsel, I'm looking at your brief. I think this is a brief of the Blue Cross Blue Shield, right? Yes, Your Honor. Which argument are you making? One, two, three, or four? I don't have those in front of me. Well, the first one is whether it's fiduciary, and the second one is whether it's time barred, and the third one is whether contractually authorized compensation constitutes self-dealing, and the fourth one is whether you violated a fiduciary duty when reporting access fees consistent with the ASC, which is a two-page argument. Is that the one you're making now, the fourth two-page argument? It may be, Your Honor. Let me turn to plant assets, which I think is our strongest argument, and there we find tremendous guidance from Pipefitters 3. Pipefitters 3 said there couldn't be a... What are you making now? I'm trying to track your argument today. I'm trying to make the plan asset argument. I'm sorry, Your Honor. I'm trying to make the plan asset argument. Which one is that? That would be the first argument, Your Honor, that the fees were not... Is there a risk of fiduciary? Unless Blue Cross dealt with plan assets, it would not be in a risk of fiduciary. I see, okay. Now, Pipefitters 3 said there couldn't be a class because you had to look at the funding mechanism of each Blue Cross contract. That couldn't be the case if the district court was right, because the district court held whenever an employer sends money to a third-party administrator like Blue Cross to be used to pay employee health care claims, all of that money is a plan asset. If that were the case, then this court was dead wrong in Pipefitters 3, because this court said... What about Pipefitters 4? Pipefitters 4, there is no issue of plan assets. Remember, the plaintiff there was a trust fund. Does that make all the difference? It makes... Is that their rationale? No, it makes a big difference, Your Honor. Was it their rationale? It was not an issue in Pipefitters at all. Pipefitters 4, from the get-go, Your Honor, knew that what was being transferred from the ORISA plan assets. That's not the case here. The SPD said, this is being funded by the general assets of Hylex Corporation. We have 20 years of Department of Labor guidance that says, unless the plan has a property interest in this payment, it can't be plan assets. Now, we heard in the amicus brief that there's a new theory called earmarking. What we know from prior advisory opinions from the DOL, earmarking, setting up a separate account even, does not create plan assets. It belonged to the workers, right? No, it belonged to the company. Well, the company was obligated under its agreement with the workers that it had to put this in. It's kind of like a trust fund with the Social Security, is it not? No, it's not a The employers all have to send in Social Security funds, whether they put them in a trust fund or not. But consider this situation, Your Honor. Blue Cross frequently made refunds back to Hylex Corporation. If that were the case, if all of the money Hylex transferred to us was a plan asset, our refund would be a exclusive benefit of the employees. Another example, Your Honor, is... I guess I just don't follow that argument. I don't see why something couldn't be a plan asset, but if you gave too much, you got some back. What's the logic of that? Well, the logic is it was Hylex's money, always was Hylex's money. It's clear that an ERISA health care plan can be funded without plan assets. It can be funded from the general assets of the employer, and the employer never surrenders its ownership interest in those funds. And that was the case here. That's the difference with pipefitters. Every dollar that the pipefitters trust fund held was, by definition, a plan asset. I'd like to turn briefly to the statute of limitations, because there you have a situation where Mr. Flack admitted that he never read anything. Annually he signed a Schedule A that said, your hospital claims will be increased to pay for these fees, right above his signature line. He said, I never read it. He never read the master contract, yet the district court found due diligence. What we have here, your honor, is the prospect of a multinational corporation recovering $5,000, excuse me, $5 million, primarily because it hired employees who didn't bother to read the contract they signed. Now, I hope that doesn't become the law in the Sixth Circuit. It's not the law anywhere else that an employee can ignore what's in a contract and then claim, well, I can invoke the fraud or concealment exception. Anyone reading these contracts would say, there is a charge being made. They might not know everything about the charge, but they know they're being charged. And that is sufficient. You are entitled to make the first charge. That was clear. They don't dispute that. It's an underlying charge that wasn't revealed that they're complaining about, right? Well, they're complaining about the provider network fee, the contingency fee, and the OTG. The OTG was the subject of pipe fitters, but even pipe fitters didn't challenge the provider network fee, because the provider network fee is what buys groups like Hylex access to the best discounts in the state of Michigan. We know that over from the, just from the pipe fitters three, that over 500 employers in Michigan have turned to Blue Cross and paid these fees for 20 years, because by paying the fee, they got the best discounts from hospitals and doctors across the state of Michigan. Now, after the fact, after having the benefit of these discounts for 20 plus years, Hylex, the corporation, says, hmm, I caught you. How about giving me back 20 years of these fees? Now, your opponent, in your opponent's brief, says that many of the issues you raise are controlled by pipe fitters four, which I guess the 2013 decision. Yeah. So you have a long third brief, and it's only mentioned pipe fitters once, I believe. Is that not responsive? We should have been more responsive. I think we did make the key distinction. I think we made two key distinctions. One is the source of the funds. The other is, remember, pipe fitters became an ASC customer in 2002, sued in 2004, and this court has said, you knew from the contract you signed that these fees were being charged. Pipe fitters four, no question that their suit was timely, that that group of fiduciaries was diligent. Here we have just the opposite. Mr. Flack, who's acting as the fiduciary for the health care plan, waits until 2011 to challenge a contract that was signed in 2002. Why did he wait? Because he testified, when I took over the role of administering health care, I didn't bother to read the company's contracts. Now, how can this court condone that as sufficient due diligence, especially when ERISA says someone like Flack, as a fiduciary, has a heightened duty to understand the contracts that provide benefits for the company's employees? What's our scope of review on that kind of issue? It's de novo on the statute. Why is it de novo? It seems kind of fact-intensive. They should have noticed. It was clear enough to them. Those are the kinds of issues, right? This court has said many times that if it's in the contract, it is noticed as a matter of law, even when the untimely... Even when they conceal it? Excuse me? Even when it's concealed? How was it concealed? There's no... That's a factual issue, is all I'm saying. I mean, you can argue about it. I'm just asking about the nature of the issue. You can say it's a legal issue and then start arguing about the facts, but that's incoherent, right? I disagree, Your Honor. What the district court has are pieces of paper in a contract, and she assesses how those pieces of paper match up with the contract. That's not a factual question. That's not a credibility question. The only credibility question the district court...Credibility judgment the HILAC's official in 2004. We don't challenge that. But when this court has only before pieces of paper, a contract, and reports called for by the contract, there's no basis for this court to give any deference to the district court. That's not a credibility assessment. But my question was whether it was a factual assessment or not, not whether it was credibility. Well, it's... If you decide facts based on the paper, we still have to defer. I don't think that's factual, and there's no factual finding that...and there's no testimony in the record that Mr. Flack looked at something and said, hmm, I think it means this. His testimony is, I didn't look at anything. Okay. Other questions? Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Perrin Reinders. I believe that this case is governed by Pipe Fitters 4. Which issues? As to whether or not Blue Cross Blue Shield is a fiduciary, whether these fees are an example of self-dealing, whether the OTG was actually authorized under the contract, the core issues. The issues that are not... Well, on the fiduciary issue, they distinguish it, at oral argument at least, on the grounds that there was a trust involved in that case, and it wasn't even an issue. Is that true? They did not challenge the question that those were planned assets in Pipe Fitters, as I think they should not have challenged that they were planned assets, just like they shouldn't. If the reason they didn't was because there was a trust, then it doesn't really control in a case where there's not a trust. Or does it? I mean, that's what I'm asking. You say it's controlling. They say it's not now. I think that the court had to get to the question of whether those were planned assets. And the court did conclude that they were planned assets because that is an essential piece to determining that Blue Cross Blue Shield was functioning as a fiduciary. That's saying that it was a holding, even though they didn't explain it. I don't have a problem with that, but they say it's distinguishable because there was a trust in that case, and there isn't a trust in this case. That is their argument, right? That is their argument. What's the response to that? Okay, I would respectfully suggest that that's not a material distinction, that that's not a principal distinction that makes a difference in an ERISA case. Why not? Well, my colleague this morning used a word. He talked about the source of the funds, and he said that the source of the funds in this case was HILACS, and that the source of the funds in the Pipe Fitters case was his trust. That's not true. The source of the funds in the Pipe Fitters case was a variety of employers. That was a joint multi-employer arrangement, multiple employers with the union under Taft-Hartley. So the money, the source of the money was not just one employer. It was a group of employers, and they established the ---- Pardon me, just so that I can understand the argument. If you owe some money and you're paying it in dribs and drabs and occasionally get refunds back because you owe some money, you could argue that kind of a legal situation. There's no trust involved. It's just a contract. On the other hand, if you owe some money and you put it into a trust, the very word trust conjures up fiduciary duties, right? So you would think that just at that simple level where there's a trust involved, there's fiduciary duties, and where there's no trust involved, unless you have some more, there's no fiduciary duties, right? Well, ERISA doesn't require the establishment of a trust. I understand, but it requires a fiduciary. There's got to be some way in which they're fiduciary. The only question is whether these are assets of the plan or, as Blue Cross would argue, that they're the assets of the employer. And when the employer takes its money, because that was the source of the money, segregates that money and sends it to the third-party administrator, and the third-party administrator now has control of that money for what? For the payment of claims, for the payment of the plan's costs for administration, for the payment of the plan's costs for stop-loss. So you're saying, in effect, when the administrator gets the money, it's like a trust when it's holding onto that money and deciding what to do with it. No question about that. These monies are not for the employer. The employer has taken its money, has fulfilled its obligation to the plan. They're obligated under the collective bargaining agreement to hold that money and turn it over to Blue Cross or whoever's going to administer it, right? You're talking about Pipe Fitters 4, Your Honor? Pipe Fitters 4, and also in this case. Aren't they required to do so? Absolutely. In Pipe Fitters 4, you had multiple employers that have negotiated with a union, and so to make that work, because that plan is administered jointly by the employers and the union, they have that intermediary structure. What's the difference between that and the situation we have in this case? I would say legally zero. In this case, it's a single-employer plan. Single employer is the sponsor. So it is the only fiduciary in terms of the employer side of the equation on behalf of and for the benefit of all the employees that are covered by the plan. And it takes its monies to fulfill its obligations, and instead of being one of multiple employers sending the money into this intermediary arrangement, it sends the money directly to Blue Cross Blue Shield. For this court to not follow Briscoe, not follow Guy Ann, not follow Pipe Fitters 4, not follow a host of cases, I'm not aware of any case that has said that money held by a TPA is not plan assets. So for this court to say that the money that Blue Cross Blue Shield holds, and it's not dribs and drabs, Your Honor, it's millions of dollars. And if the employer doesn't put it in there, then the employees would have a right to sue them or somebody. Yeah, and in fact, I would like to point out that the summary plan description addresses that. And I think something that was not identified in the briefs, but it's in the summary plan description, which is, of course, a part of the record. On page 22 of the summary plan description, which is in the appendix at page 762, the summary plan description notifies participants that they may, and I quote, file suit in federal court if the fiduciaries misuse the plan's money. Fiduciaries, plural, misuse the plan's money. So the SPD recognizes it has informed the plan participants that they have these rights under ERISA to sue fiduciaries, not just one fiduciary. There are any multiple fiduciaries that may exist with respect to misuse of the plan's money. So if the employer sponsor, which is a fiduciary, does not uphold its end of the bargain by funding the plan obligations, there would be an issue there, an ERISA issue. And if the third-party administrator that has control over those plan assets misuses that money, as it did here, as the judge found based on nine days of testimony and whatnot, there's an ERISA issue. But it seems like the fiduciary duties that we normally talk about in ERISA cases are fiduciary duties towards beneficiaries or for the plans that benefit the beneficiaries. Is that right? No question that that's the vast majority of cases. It seems a little bit anomalous that this fiduciary duty towards the employer would be involved. The fiduciary duty is not to the employer. The fiduciary duty is to the plan. I represent today, right this minute, the plan. I represented the plan when we tried this case. The money that the employer pays is not the employer's money, just paying something. It's the employer paying on behalf of the plan to fulfill its obligations to the plan, to fund that plan. So when Blue Cross Blue Shield But insofar as the plan is paying health benefits, which is the benefit to the employees, there's no allegation that that was shortchanged at all, is it? Well Or even potentially shortchanged. Imagine It's just that they took too much money into the They just took some other money. The theory goes, right? I get that. What's the answer? It's hard for me to articulate, so I appreciate that you get it. What's the answer, though? I would like to make two points, Your Honor. One is that as soon as the employer fulfills its obligation by sending the money to Blue Cross Blue Shield, it's not the employer's money. It's the plan's money. And now when Blue Cross Blue Shield misuses that money, it's misusing the plan's money. Period. If that money hadn't been misused, there would have been more money available for benefits. But the benefits wouldn't have been paid. It just would have gone back to Hilex, right? No. Maybe Hilex is able to provide bigger benefits. Maybe the plan It doesn't really matter when those plan assets are misused by Blue Cross Blue Shield. They are misusing the plan's money, not the employer's money. In any event, pipe fitters resolved that in your favor. It did. But in the context of a trust. It did. If we find the trust to be an artificial distinction, then we're just controlled by pipe fitters on this issue that I'm raising. I believe that's correct, Your Honor. And I would point the court to cases like Guyana-Briscoe where there was no trust, Patalco where there was no trust, you know, any number of cases where TPAs hold money. There's never a question about whether there was a trust or not. It's clear that the TPA has fiduciary responsibilities to protect that money. How do you respond to Blue Cross's statement that there's no deception because one of your executives said he didn't even read the document? I'm glad you brought that up. That was the other point I wanted to make. Mr. Flack was the third of three CFOs that worked for Hylex during this time period that we're talking about. There was a Mr. Schultz and a Mr. Welsh and then Mr. Flack. The 2002 ASC was signed before Mr. Flack became the CFO. It was signed during Mr. Welsh's tenure. Mr. Welsh is the one who, through the use of a consultant, asked Blue Cross Blue Shield specifically, what does this language, they're now relying on, what does that mean? And he got no good answer. He got the runaround is what he got. And so then he, as the CFO, was supervisor over an RFP process. And that's where we hear about Blue Cross Blue Shield actually representing to Hylex specifically in response to an express question that these charges, network access and the like, are not applicable. At least they are not applicable to Hylex. So Mr. Flack comes into that arrangement. The ASC has already been signed. The ASC has already been described as not involving these network access fees or whatever they like to call it. So it's not Mr. Flack's falling down on the job. The question's been asked and the question's been answered. And Mr. Flack continues to get the false reports month after month and quarter after quarter and year after year, not only misrepresenting the amount of claims but misrepresenting the amount of the compensation being taken by Blue Cross Blue Shield. Counsel, before you sit down, I'd like to address a comment that I have personally, not reflecting my colleagues necessarily, about complying with the spirit as well as the letter of the appellate briefing rules. We have a cross appeal in this case which is, I think you both would agree, a fairly minor issue compared to the other issues. Total briefing on that appeal, from all parties together, less than 10 pages. But that cross appeal was sort of a tool under the rules to enable the briefing on the other issues to greatly exceed what otherwise would have been there. So a reply brief that we're normally reading that's 30 pages comes from you and then 56 pages. And then there's a surreply brief which deals primarily with an issue which shouldn't have even been in the surreply brief at all. So I can just tell you when judges are reading these things and they feel like the rules have been taken advantage of, it doesn't make them sympathetic to your arguments. Well, I appreciate the court's honesty there and I'll take it to heart. Thank you. Thank you. May it please the court. Robin Springberg Perry on behalf of the Department of Labor. After a nine-day trial, the district court held that Blue Cross knowingly deceived HILEX and took $5 million in hidden fees from money intended to pay plan benefits and expenses. Now, all of the facts here go to the actions and representations of the parties, which is one of the factors that DOL, in its 20 years of guidance, has said to look at as to whether something is plan assets. In this case, Blue Cross had sole control over the funds,  HILEX transmitted the funds for plan purposes, and both Blue Cross and HILEX knew this. Once the funds were segregated from the employer's general assets and transferred to satisfy plan obligations, they were plan assets. On this issue, your opposing counsel says that your position is different from prior rulings by the department. That's incorrect, Your Honor. Why? Earmarking, as we described it here, is not a new theory. It's part of the actions and representations of the parties. What do you do with the specific citations that they make? Are they distinguishable? I don't have them before me, but they refer to particular rulings that they say are inconsistent with that. Yes, Your Honor, because they are ignoring the fact that those AOs, those advisory opinions, refer to the actions and representations of the parties. And they refer to various factors you look at, including the plan documents and a trust, but nowhere have we ever said that those are the only factors to look at, that if there's no trust, that they're not plan assets. We have never said that, Your Honor. And this case has many of the indicia that we have looked at in prior cases. We say when it's been segregated from the employer and sent to a separate account. In this case, the separate account was held by Blue Cross. And it was a combined account, a multi-plan account, but that does not make it, that does not mean that it didn't have plan assets. And, in fact, we have said in our advisory guidance, in our advisory opinion 9224A, we discussed a combined claims account that contained funds from multiple self-funded welfare plans. That's actually one of the citations that they use, but they don't point to that. In this case, Blue Cross was expressly permitted to withhold funds from the account. The contract refers many times to health care coverage and benefits, so it's clearly discussing payments that will be made for the purpose of providing plan benefits and admitted plan expenses, agreed to plan expenses. It's very clear that the payments are only made for the purpose of providing health claims and benefits. And Blue Cross's meticulous, though misleading, apparently, discussion, accounting back to Hylex for how the money was spent, showed how every dollar that Hylex sent it was spent for plan expenses and for plan claims, except that they did not make clear that they were hiding some of the fees as found by the district court. They sent this out on a monthly basis? On a quarterly basis, I believe, Your Honor, yes. Over the years. But it specified what it was taken out for? Yes, Your Honor. But it didn't have these additional charges? That's correct, Your Honor. It represented hospital claims, but the district court found that some of that hospital claims was actually hidden fees that were not referred to in the contract. Is there any daylight between your position and that of Hylex? No, Your Honor. On the issues in this case, you're with them all down the line? On the issue of plan assets and on the issue of fraud or concealment, Your Honor, there may be some points here or there, I'm not sure, but on everything that we've discussed. But the Department of Labor's position, and it has been for a long time, is that if it's been segregated from the employment account and sent to a third party for the purpose of providing plan benefits, that's enough to tell us what the plan assets are. Did you appear amicus below, or is this the first time? This is the first time, Your Honor. And you didn't appear amicus in the pipe fitters case? No, Your Honor, we didn't appear then. Anything we can derive from that? I mean, what's going on? No, Your Honor, we may not have been asked to appear. Sometimes we find the cases and sometimes they find us. And while I'm on that, does the Department of Labor still need to get solicitor general approval to file amicus in the Court of Appeals? Yes, Your Honor. And you have that? Yes, Your Honor, and we give them a detailed memo as to what we are going to be arguing. Right. And the other question I had along those lines is why then you don't put the U.S. Attorney's name on your brief? Is that just a change in style? I mean, it used to be that that's what you would do. It doesn't have any significance? No, Your Honor, I don't believe that our division has ever done that. The other parts of the Office of the Solicitor need to actually have the Attorney General appear with them, but the division that does ERISA does not. We have our own litigating authority. I see. We just need to get approval also. We need to get approval. Yes. Thank you. If there are no more questions, thank you, Your Honors. Questions? No, thank you. The summary plan description that Hilux Corporation prepared said, there is no trust. We pay benefits out of our general assets. The Department of Labor, in 1992, in advisory opinion, excuse me, 1993, advisory opinion 02 said, an employer sponsor of a welfare plan may maintain such a plan without identifiable plan assets by paying plan benefits exclusively from the general assets of the employer. In advisory opinion 92-24A. That's what they did here, right? No. They paid it from their general assets. They sent on a weekly basis by wire funds to a general Blue Cross account that did not have the name of Hilux on it, did not have the name of pipe fitters on it, did not have anybody's name. Is that fatal because they don't have somebody's name on it? That's very critical under the case law and the guidance. Remember, in Briscoe, the money that was improperly paid was from a plan account established at a bank. Guyan, likewise, each contract between the employer and the third-party administrator said, the third-party administrator will set up a separate account in the name of the plan. And the DOL tells us that you can either have a trust, and I'm reading from 92-24A, or a separate account with the bank or other third-party in the name of the plan. That's how you create property interest on behalf of the plan. You don't have that, and that's critical. And let me correct one mistake my friend said. He said, I want to get the full force of your argument. You're citing these labor advisory opinions for the proposition that something that didn't occur here is essential to create plan assets. So it's sort of a negative inference from that. Right. And that the cases that this court has found plan assets have had that critical factor, a separate account in the name of the plan. You're saying if you don't have a separate account, it's not applicable here at all? It's not plan assets. When we deal with those monies. Are there advisory opinions or any other source that says that? Says the converse? Or the inverse? I think there's a case that the DOL cites, N. Ray Halpin, I think it's the Second Circuit, that applied those principles to find that something was not a plan asset. Slightly different context, but it applied those instances of DOL guidance. And it's cited in their brief. One point, Your Honor, my friend said that from this weekly wire, funds were taken to pay, I think he said, the plan's cost for stop loss. Stop loss was an asset of HILACs. It protected HILACs. It's like the case of Taylor Chevrolet, where I think Your Honor was on that panel, that said a fight between an employer and the stop loss carrier doesn't implicate ERISA. And that's what we have here. Out of those weekly transfers, monies went to Blue Cross to pay for stop loss insurance coverage. If that's the case, then every time it sent a wire, HILACs violated the exclusive benefit rule. But that assumes that what it transfers were plan assets. If it transferred its own money, it had every right to take part of that and pay stop loss premiums. If it transferred its own money, it had every right to agree with Blue Cross, consistent with all the Michigan case law, that we're going to pay these separate fees calculated according to Blue Cross's standard operating procedures. And that's another issue. If Blue Cross calculates something, and it did this for hundreds of employers like HILACs, at standard rates, that's not the exercise of discretion under the case law. It didn't make a decision specific to HILACs. It didn't say, this week I'm going to charge HILACs 20%. No, it said, for all of my ASC customers, except ones who made separate arrangements, I'm going to charge a set percentage, and that set percentage will bring the benefit of big discounts to these employers. Ask HILACs today, who provides the administration in discounts for your employee health care plan? Blue Cross. They didn't leave us. I would think if they really believed they were defrauded, they'd want to be as far away from us as possible. But no, they're still with us today. And that's why I think you've got to look at the basic issues. Are they using plant assets? No. Did they exercise diligence? FLAC may not have signed the 2002 ASC, but every year thereafter, he signed it, Schedule A. And right above the signature line, it said, Blue Cross will charge these fees. He says that he called your client's office and they didn't give him a good answer. No. In 2003, a consultant spotted these fees and said, how much are they? And we said, well, they're added to the hospital claims. We didn't hide the fact. And then it's an email exchange that just disappears at some point. But we didn't. There's no lie there. Now, I don't know if ERISA imposes a duty on service providers to provide answers to employers, because I think Your Honor pointed to the issue here. This is a strange ERISA case. No beneficiary has suffered at all. They've gotten everything they want. Well, the argument is they sort of indirectly suffer because if it's costing the employer more than he thinks he's paying, he's properly paying, he could provide more generous benefits or not charge them for it or whatever. Play that out to its logical extreme. Every expense the employer has could be converted to benefit claims. Yeah, but it's an expense that's taken away from him by a fiduciary who owes some sort of fiduciary obligation to eliminate that. We don't owe a fiduciary obligation to Hylex. The law did not create – ERISA didn't create the highest duty known to law so that professional – Well, Counsel, our circuit has held that a third-party administrator such as Blue Cross becomes a ERISA fiduciary when it exercises practical control over an ERISA plan's money. That's precisely what our circuit owes. And we don't disagree. The fight is over are these funds plan money. We say they're not. We say they're employer money. They disagree. That's the basic issue in this case. And I think if Your Honor looks at the DOL guidance as applied – They had the control over that money before it got to the beneficiary, though, didn't they? In some real sense, they had the control because they took the money out. And we paid the hospitals. We paid the doctors. But we paid them with – You say we. Blue Cross paid. Blue Cross paid. But that doesn't make it plan money. They took some money from themselves that you dispute, that the parties dispute, the extent to which Hylex knew that they were taking that extra money out. But they took the extra money out, though, right? Excuse me, Your Honor? You. We took the extra money out of the – it came from the weekly wire transfers. It came from Hylex. Some of it was taken out and given to themselves, and some was taken out and given to the OTG fund or whatever it was. And then the hospitals got what they were charging for. That's what happened. But the taking out was done by Blue Cross, right? Clearly, Your Honor. It wasn't done by Hylex. Yeah, we took out – So they had the money when they took it out of it, in a sense, right? The question is whose money was it? It was Hylex's money. That's our position, and we think the case law and the DOL guidance backs us up. But it's Hylex's money that you had in your hand. It's Hylex's money, but it's no different than Taylor Chevrolet. Not only do you have it in you, you have complete control over it. As long as we deal with it according to our contract, we have significant contractual restraints on our ability to deal with that money. We have to pay the hospitals. We have to pay the hospitals a certain amount. In many ways, this is no different than the DeLuca case. There we had complete control over the discounts we negotiated with hospitals, but we still have the restraints of our contract with our ASC customers. We're not saying there might not be a breach of contract. That's what the state law case is, where counties and cities said we breached the contract. Michigan Court of Appeals said we didn't. We don't have free reign, Your Honor. We're highly regulated. The question is whether you have some discretion, and it looks like you're exercising your discretion when you just take some of that money. It's not clear how much it is. You can see why that looks to the decision-maker like exercising discretion over money that's in your hand. Well, it's no different than McLemore, where the bank exercises, quote, discretion when it takes out fees, but it's according to a fee schedule. We have a set rate for all of our ASC customers. It's not set by, according to this plan or that plan. Yes, it's not known to the HILACs. If they asked, they would have known, but they weren't even aware, apparently, that we were charging the fees because they didn't read. They said you wouldn't tell them. That's what their position is. Well, the record doesn't bear that out, Your Honor, not at all. That's what they're saying here because how else do you defend a CFO who gets up on the stand and says, you know, I don't read these things. I just sign them. He did not read the ASC contract, according to his testimony, until after suit was filed. Now, if that's going to be the Sixth Circuit standard of diligence… The ASC contract, before the suit was filed, all it said was there are some other fees that we're charging you. It said… It doesn't say how much or who or which or what. Admittedly, Your Honor, it wasn't until 2007 where we told every ASC customer the annual amount of the fee. 2007. Prior to that, we told them we're charging it. Some customers asked us, well, how much? But we don't owe, under ERISA at least, that duty to an employer. There is no rule that a service provider has some special obligation of candor to an employer. Well, the district court found that the discovery or should have had a discovery started in 2007. That's what the district court… And that's when the statute of limitations began to run. But the only way that makes sense is if there is a duty under ERISA on our part to disclose a precise dollar amount to our customer. Keep in mind, every case they cite on disclosure… I don't know whether it has to be a precise dollar amount or a formula for how it's calculated. It could be… There's nothing like that in there. We have a formula… We could take some additional fees out. Excuse me, Your Honor? There's nothing like, and we'll take a percentage between 3% and 4% out of each payment to X during the period Y. It's just we're going to take some extra fees out, right? Right. That's all it says. But we know that it was according to a standard operating procedure that was completely… Standard internal operating procedure. Correct. But if asked, it would have been disclosed. Sometimes was waived. It was waived for the trust funds in 2004. I don't know the reason. I thought there was testimony that like half of them weren't paying it. No, Your Honor. There was not testimony but an email that the district court pointed to that said individual underwriters, if requested, could make a separate arrangement with a particular group. In other words, if Hylex had said, instead of paying the percentage, we'd like to pay a set amount per employee, we could have worked that arrangement out. But we still had to get from somewhere the money that allows us to maintain these networks. These networks are what provide the discounts, and that's why people keep coming back to us. Now, in the world of business, it was a completely satisfactory arrangement. That's why they want to put the ERISA overlay. But the ERISA overlay is to protect employees, not employers. That's the fundamental problem with this case. Okay. Thank you, Counsel. Thank you very much, Your Honor. These will be submitted. I think you can go ahead and adjourn the court.